**Franz SEMMLER, Plaintiff,**

v.

**AMERICAN HONDA MOTOR CO., INC. and Honda Motor Co., Ltd., Defendants.**

**No. C2–95–316.**

United States District Court, S.D. Ohio, Eastern Division.

May 2, 1997.

Richard G. Taft, Strauss & Troy, Cincinnati, OH, Victor M. Wigman, Wigman, Cohen, Leitner & Myers, Washington, DC, Herbert Stanley Rosenblum, Rosenblum & Rosenblum, Alexandria, VA, for plaintiff.

Mary Ellen Fairfield, Vorys, Sater, Seymour & Pease, Columbus, OH, Nicholas L. Coch, Rogers & Wells, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

In this patent infringement suit, the plaintiff Franz Semmler ("Semmler"), owner of U.S. Patent No. 4,207,845 (the "Semmler patent") asserts claims against defendants American Honda Motor Co., Inc. and Honda Motor Co., Ltd. ("Honda"). The Semmler patent relates to an automotive fuel control device. Semmler applied for his patent on December 28, 1976. It was issued on June 17, 1980.

After a *Markman* hearing[1] on the issue of claims interpretation, this Court construed the claims of the Semmler patent to refer to a device which interrupts the supply of fuel each and every time the speed of the engine exceeds the speed normally associated with the position of the throttle in order to effect a fuel savings which would be considered

important and substantial to one skilled in the art in 1976. *See* Memorandum Opinion and Order, September 30, 1996; Order of December 16, 1996 (granting in part and denying in part motion for clarification and/or reconsideration of memorandum opinion and order of September 30, 1996).

Claim 1 of the Semmler patent describes an apparatus which includes: 1) a means for interrupting fuel supply under closed throttle conditions when a speed value is exceeded (closed throttle fuel cut); 2) a means for interrupting the fuel supply when a predetermined maximum vehicle speed is exceeded (speed governor); and 3) a means for interrupting the fuel supply during open throttle conditions whenever the engine is overrunning based on a comparison of engine speed and the position of the throttle (open throttle overrunning fuel cut). Claim 5 is limited to the open throttle overrunning fuel cut device described in Claim 1. Claim 17 is limited to an apparatus which includes means for interrupting the supply of fuel whenever the engine is overrunning which is independent of the position of the throttle (open and closed throttle overrunning fuel cut).

All three of the independent claims include the limitation that the claimed apparatus interrupts the fuel supply whenever the engine is overrunning to effect a considerable fuel saving. The closed throttle fuel cuts in Claims 1 and 17 and the speed governor described in Claim 1 were known in the prior art. The accused device does incorporate a closed throttle fuel cut but Semmler does not assert that his patent covers such a device. The claims of infringement are directed, instead, to the means for effecting the open throttle overrunning fuel cut described in Claims 1, 5 and 17.

Claims 1 and 5 of the patent include the following elements: 1) a selecting means (throttle) for regulating the supply of fuel to the engine which is moveable to select a supply between maximum supply and idling supply; 2) means for interrupting the supply of fuel which comprises a control device and means for switching said control device; 3)

---

**1.** *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)

(noting sources of intrinsic evidence district court should use to ascertain meaning of claims).

means for monitoring engine speed; 4) means for monitoring the state of the selecting means; and 5) a control circuit in which the two monitoring means are linked together, and which provides a fixed relationship between the selecting means and engine speed so that whenever the engine is overrunning, the supply of fuel is interrupted to effect a considerable fuel saving. Claim 17 contains all of the elements of Claims 1 and 5, except that Claim 17 does not specifically describe the control circuit which provides the fixed relationship which interrupts the fuel supply. Instead, Claim 17 claims a means for effecting an interruption of the fuel supply whenever the engine is overrunning, whereby considerable fuel saving is obtained.

According to the Semmler patent, overrunning occurs whenever the speed of the engine exceeds the speed which is associated with a particular throttle setting. This is the fixed relationship which is incorporated into the control circuit which links together engine speed and throttle position and effects the fuel cuts. In the specification of his patent, Semmler acknowledges that the relationship between throttle position and engine speed varies with the demand on the engine which may range from no demand to heavy demand. Jt.Ex.I, Semmler Patent, Col. 7, Lines 34–56. He teaches that the overrunning fixed relationship for the control circuit should be set so the vehicle can always reach its maximum speed within an expected engine demand range which is based on the anticipated range of road load conditions. *See* September 30, 1996, Mem. Op. & O., pp. 13, 14. The range of road load conditions would extend from light demand when the vehicle is lightly loaded and traveling on a level road to high demand when the vehicle is heavily loaded climbing a hill. Automotive engineers refer to this range of engine demand as the road load line.

This matter is now before the Court on defendants' motions for summary judgment on invalidity and non-infringement. The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Addickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby,* 477 U.S. at 257. It is not sufficient for the nonmoving party to merely "show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

"Summary judgment is as appropriate in a patent case as in any other where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law." *Spectra Corp. v. Lutz,* 839 F.2d 1579, 1581 n. 6 (Fed.Cir.1988). However, "it must be employed carefully, 'for an improvident grant may deny a party a chance to prove a worthy case.'" *Lemelson v. TRW, Inc.,* 760 F.2d 1254 (Fed.Cir.1985) (citation omitted).

## I. INVALIDITY

### A. LEGAL STANDARDS

▮▮▮ The validity of a patent, like any other issue, may be determined on summary judgment. *See, e.g., Ryko Mfg. Co. v. Nu-Star, Inc.,* 950 F.2d 714, 716 (Fed.Cir.1991); *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1567 (Fed.Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218

(1988); *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1020 (Fed.Cir.1985). A patent is presumed valid and the burden of persuasion is, and always remains, on the party asserting invalidity. 35 U.S.C. § 282; *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1359 (Fed.Cir.1983). The defendant has, the burden of establishing the invalidity of the claims of the patent by clear and convincing evidence. *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1423 (Fed.Cir.1988) The burden of persuasion may be more easily met where the challenger produces prior art that is more pertinent than that considered by the Patent and Trademark Office ("PTO"). *Id.* Issues addressing the validity of a patent include anticipation, obviousness and indefiniteness.

**B. ANTICIPATION (35 U.S.C. § 102)**

Section 102(a) of Title 35, United States Code, provides that a person shall not be entitled to a patent when:

> the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent[ .]

**1. Dolza Patent**

■ Honda asserts that the Semmler patent is invalid under 35 U.S.C. § 102(a), because it is anticipated by U.S. Patent No. 2,891,527 issued to Dolza on June 23, 1959. Dolza was not before the PTO when it considered Semmler. Dolza bears a striking similarity to Semmler. It is more relevant than any of the prior art before the PTO. Like Semmler, Dolza describes a device for interrupting the fuel supply to an automobile engine during overrunning in order to save fuel. Defendants' Motion for Summary Judgment, Appendix, Dolza Patent, Col. 6, Lines 39–42. Like the Semmler patent, it defines overrunning as the situation when the speed of the engine exceeds the normal engine speed for the throttle setting. *Id.*, Col. 4, Lines 50–55. However, the structure disclosed in Dolza is purely mechanical, whereas the structure disclosed in Semmler is electrical.

Honda previously moved for summary judgment on the ground of obviousness in light of Dolza, and this Court held:

The claims of the Semmler patent are anticipated by the language of Dolza which contemplates both open and closed throttle fuel cuts. However, the specification of the Dolza patent does not specifically disclose a mechanism which would effect an open throttle fuel cut. Furthermore, the Dolza device is a purely mechanical device, whereas the Semmler device is based upon an electrical control system. Thus, genuine issues of fact remain regarding whether Dolza sufficiently describes a device which would effect an open throttle fuel cut so as to be enabling and whether or not the Semmler electrical control system is an equivalent structure under 35 U.S.C. § 112, ¶ 6.

Memorandum Opinion and Order, October 1, 1996.

Honda argues that summary judgment is now proper because Semmler's expert, Dr. Patterson, has agreed that the apparatus disclosed in Dolza has the capability of performing an open throttle fuel cut. The Court notes that Dr. Patterson has testified only that the mechanism depicted in the Dolza drawings would reduce the fuel supply as the throttle approaches the closed position. The Court has also examined the supplemental declaration of Honda's expert, Dr. Citron, who asserts: 1) that the apparatus disclosed in the Dolza sketches is capable of substantially reducing fuel flow in a limited range of open throttle conditions; and 2) that with the addition of a lost motion mechanism, the Dolza device is capable of shutting off the flow of fuel over a large range of open throttle conditions. Honda counters by arguing that Citron's computer simulation based on the Dolza drawings is invalid because patent drawings are not necessarily drawn to scale.

The Court remains convinced that Honda's assertion that the Semmler patent is invalid because it was anticipated by Dolza presents genuine issues of fact and that summary judgment on this issue is not appropriate.

**2. Mitsubishi Patent Application**

■ Honda asserts that Claims 5 and 6 of the Semmler patent are anticipated by a device disclosed in a patent application filed in the Japanese Patent Office by Mitsubishi

Electric Corporation ("Mitsubishi") on October 26, 1972. This application describes an automobile engine control system which will "partially or completely cut off either the fuel or the fuel and air supplied to the cylinders when, ..., the power output exceeds the power output needed, ... to purify the engine exhaust, reduce fuel costs, and enhance engine cooling efficiency." The application acknowledges the existence of prior art devices "to cut off the fuel supplied while an automobile was coasting, especially during times of engine braking when transitioning from high speeds to slow speeds[.]" The claimed novelty of the Mitsubishi device is the ability to cut off fuel in constant speed or accelerating states. The Mitsubishi application was not before the PTO when it considered Semmler.

The Mitsubishi patent application describes a device by which signals from detectors, including a throttle opening or intake manifold pressure (Pb) detector, a vehicle speed detector and an engine speed detector, are processed by a computer which controls the fuel supply. Signals from the throttle opening detector are compared with the signals from either an engine speed detector or a vehicle speed detector, and when it is decided that the power output is excessive, the supply of either fuel or fuel and air is cut off, intermittently, at a rate relative to engine speed.

Mitsubishi does not anticipate Semmler. It does not use a fixed relationship between throttle position and engine speed as the determinant of the open throttle fuel cuts. It does not interrupt the supply of fuel whenever the speed of the engine exceeds the speed normally associated with a particular position of the throttle. The fuel cuts effected by the Mitsubishi device are determined not only by throttle setting and engine speed but other factors, including engine oil temperature, cooling water temperature, cylinder head temperature, intake air temperature and Pb. Furthermore, in Mitsubishi, the fuel is not completely shut off until overrunning has ceased. Instead, it is shut off only intermittently at a certain rate relative to the number of revolutions per minute (RPM).

### 3. Hisatomi Patent

■ United States Patent No. 4,008,696, issued to Hisatomi on February 22, 1977, discloses a fuel control system for a carbureted internal combustion engine, which includes a device which monitors engine speed, Pb and throttle valve position and which shuts off the supply of fuel to the engine at a predetermined engine speed when the throttle is closed or when Pb exceeds a predetermined level. The purposes of the Hisatomi device are to protect the catalytic converter from damage from overheating and to improve fuel economy. The Hisatomi patent was not before the patent office when it considered Semmler. Hisatomi teaches open and closed throttle fuel cuts at a fixed Pb. Honda asserts that to the extent Semmler would argue (improperly, according to Honda) that Claim 17 of the Semmler patent is not limited to the overrunning fixed relationship disclosed in the patent, such a claim would be anticipated by Hisatomi. Indeed, Hisatomi does teach an open throttle fuel cut at a fixed Pb. Therefore, to the extent Semmler argues that his patent covers all open throttle fuel cuts, his claimed invention would be anticipated by Hisatomi. The Court has concluded, however, that all of the independent claims of the Semmler patent contain the overrunning fixed relationship limitation. *See* p. 978 *infra.* This being the case, they are not anticipated by Hisatomi.

### C. OBVIOUSNESS (35 U.S.C. § 103)

Section 103(a) of Title 35, United States Code, provides as follows:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

■ A determination that an invention would have been obvious under 35 U.S.C. § 103(a) is a conclusion of law based on fact. *Ryco, Inc.*, 857 F.2d at 1423; *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568

(Fed.Cir.), *cert. denied.*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Where there is no genuine issue regarding the underlying facts, summary judgment may be granted on the issue of obviousness even though the ultimate legal conclusion of obviousness may be disputed and even though some facts favor obviousness and some non-obviousness. *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed.Cir. 1988).

■ Although the Court has concluded that Semmler is not anticipated by Dolza or Mitsubishi, the Court finds that the independent claims of the Semmler patent are obvious as a matter of law in view of Dolza, Mitsubishi and other prior art which was before the patent office.[2] Dolza and Mitsubishi are more pertinent than the prior art that was considered by the PTO.

While there is a genuine issue of fact whether the mechanical device described in the Dolza specification is capable of effecting an open throttle fuel cut, Dolza claims that capability. It is undisputed that the Dolza device is capable of at least reducing the supply of fuel during some open throttle conditions. At the very least, Dolza teaches that an open throttle fuel cut is desirable whenever the engine is overrunning in order to save fuel, just as claimed by Semmler. Dolza clearly anticipates the closed throttle fuel cut claimed by Semmler.

Mitsubishi discloses a device which is capable of monitoring engine speed and throttle position and effecting open throttle fuel cuts. Like Semmler, the Mitsubishi device includes a throttle opening detector, an engine RPM detector and a vehicle speed detector. Signals from these detectors are processed by a computer. The signals from the throttle opening detector are compared with the signals either from the engine RPM detector or the vehicle speed detector, and "when it is decided that the power output is excessive, the supply to the engine of either the fuel or the fuel and air is cut off." It is obvious that the determinant of when the power output is excessive could be the overrunning fixed relationship taught by Dolza and Semmler. Unlike the mechanical device depicted in the Dolza specifications, the Court has no diffi-

culty in finding that the computerized device described in Mitsubishi is capable of effecting such fuel cuts. Indeed, Semmler himself acknowledged in his patent application that a computer could be used to perform this operation. *See* Jt.Ex. I, Semmler Patent, Col. 8, Lines 26–27. It would be obvious to anyone skilled in the art to combine the teachings of Dolza and Mitsubishi to produce the overrunning fixed relationship fuel cut claimed by Semmler. Thus, Semmler is obvious in light of Dolza and Mitsubishi.

## D. INDEFINITENESS (35 U.S.C. § 112)

■ Section 112 of Title 35, United States Code, second paragraph, provides:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

If the limits of a patent are not adequately defined, a zone of uncertainty is created which would discourage invention. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 1396, 134 L.Ed.2d 577 (1996). If it is shown by clear and convincing evidence that claims are indefinite, they may be held invalid as a matter of law. *Morton International, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed.Cir.1993). Whether a claim is invalid for indefiniteness requires a determination of whether those skilled in the art would understand what is claimed when the claim is read in light of the specifications. *Id.; Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir. 1986). Claims must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir. 1985).

■ If the Court were to accept Semmler's arguments regarding the meaning of the terms "whenever the engine is overrunning" and "considerable fuel saving," the patent would be invalid for indefiniteness. As the Court noted in its Memorandum Opinion and Order of September 30, 1996, p. 11:

---

**2.** *See* discussion of *Adler, infra*, pp. 979–980.

"Semmler's position is that overrunning as used in his patent occurs when the speed of the engine exceeds a predetermined speed established by *any* fixed relationship between engine speed and throttle position. Under this definition, overrunning would be a hypothetical construct divorced from any consideration of engine load or demand. This definition would eliminate the necessity for using the word 'overrunning,' as the condition it defines would be completely described by simply stating that a fuel cut occurs whenever the engine speed exceeds the speed determined by the fixed relationship. Indeed, this is how Semmler originally expressed his claim. Under this definition Semmler would be free to select any fixed relationship between engine speed and throttle position and call it overrunning. In this way, he could confine overrunning to any condition of load or demand he might choose." (Emphasis in original)

If the Court were to adopt Semmler's definition of overrunning, those skilled in the art would not understand what is claimed in his patent.

The limiting language "considerable fuel saving" is problematic. The Court has construed the phrase to mean a fuel-saving that one skilled in the art in 1976 would have considered large, substantial or important. Even when construed in this manner, this claim fails to satisfy the definiteness requirement of 35 U.S.C. § 112. The difficulty in ascribing definiteness to this claim is demonstrated by the fact that Semmler's experts, who are highly skilled in the art, have taken the position that fuel savings of one percent, or even less, fall within the definition of "considerable". *See* pp. 984–985 *infra.*

The Court concludes that the expression "considerable fuel saving" in the Semmler patent is like the term "partially soluble" in *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448 (Fed.Cir.1985), and the expression "about" in *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 927 F.2d 1200 (Fed.Cir.1991). The term "considerable fuel saving" does not reasonably apprise those skilled in the art as to the scope of Semmler's claim, nor is it as precise as the subject matter permits. Semmler could have measured the fuel savings obtained by his

device and expressed the limitation in terms of a percentage or range of percentages. The Court finds that this limitation of the Semmler patent does not satisfy the definiteness requirement of 35 U.S.C. § 112, and that Claims 1, 5 and 17 of the Semmler patent are invalid for indefiniteness.

## II. INFRINGEMENT

### A. LEGAL STANDARDS

Infringement is determined under a two-step analysis. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 969 (Fed.Cir.1995). In the first step, the court interprets the claims of the patent as a matter of law to determine their meaning and scope. In the second step, the trier of fact applies the claims to the accused device. *Id.* In order to find infringement, it must appear that all of the elements of the patent are found in the accused device either literally or by equivalence. *See Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512 (Fed.Cir.1995) (en banc), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Charles Greiner & Co., Inc. v. Mari–Med Mfg., Inc.,* 962 F.2d 1031, 1034 (Fed.Cir.1992); *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1537 (Fed.Cir. 1991).

The Honda device which allegedly infringes the Semmler patent is the subject of United States Patent # 4,491,115, issued to Otobe and Yamato on January 1, 1985 (hereinafter "Otobe"). Semmler acknowledges that the Otobe patent is representative of the Honda fuel control system at issue in this case. Declaration of Alfred G. Collins, January 7, 1997, ¶ 2. The Honda device is a computer-operated system for controlling the fuel supply to an automotive engine upon deceleration. It monitors engine speed, throttle position and Pb. The Honda device effects both open and closed throttle fuel cuts when the engine is operating in a predetermined operating region, which is determined by the speed of the engine and Pb. The purpose of the Honda device, as described in the summary of the invention, is to improve the emission characteristics and fuel consumption of the engine and to prevent damage to the catalytic converter. The Honda

device will interrupt the fuel supply independent of throttle position and depending on Pb when engine speed is above 2,000 RPM. The Honda device is not designed to effect a fuel cut below 2,000 RPM because Honda has determined that damage to the catalytic converter will not occur below that engine speed. The Honda device interrupts the fuel supplied to the engine at speeds over 2,000 RPM when the relationship between Pb and engine speed are such that the temperature in the catalytic converter would approach 900 degrees centigrade. These fuel cuts occur below the no-load line, an operating region of the engine in which there is no demand on the engine.

Honda claims that four elements of the Semmler patent are not found in its system: 1) means for monitoring the state of the selecting means; 2) the overrunning fixed relationship; 3) a fuel cut whenever the engine is overrunning; and 4) considerable fuel saving.

## B. MEANS FOR MONITORING THE STATE OF THE SELECTING MEANS

### 1. Literal Infringement

Claims 1 and 5 of the Semmler patent expressly require that the patent device include a "means for monitoring the state of the selecting means". Such a limitation is implicit in Claim 17 because Semmler's definition of overrunning requires a comparison of the position of the throttle and the speed of the engine. The selecting means is the throttle or accelerator pedal, and the means for monitoring the selecting means disclosed in the Semmler patent is a potentiometer mechanically connected to the accelerator pedal. The Honda device monitors Pb and engine speed to determine when a fuel cut should occur. Semmler argues that monitoring Pb is equivalent to monitoring throttle position.

35 U.S.C. § 112, paragraph 6, provides:
An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Under this provision, an applicant can describe an element of his invention by the result accomplished or the functions served, rather than describing the item or element to be used. The broad literal language of such a claim must be limited to only those means that are "equivalent" to the actual means shown in the patent specification. In *Valmont Industries, Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042 (Fed.Cir. 1993), the Federal Circuit explained the effect of the second clause of paragraph 6:

The second clause of the new paragraph, however, places a limiting condition on an applicant's use of means-plus-function language. 35 U.S.C. § 112, ¶ 6. A claim limitation described as a means for performing a function, if read literally, could encompass any conceivable means for performing the function. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386 (Fed.Cir.1989). This second clause confines the breadth of protection otherwise permitted by the first clause. *Id.* The applicant must describe in the patent specification some structure which performs the specified function. Moreover, a court must construe the functional claim language "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. Section 112 thus permits means-plus-function language in a combination claim, but with a "string attached." The "attached string" limits the applicant to the structure, material, or acts in the specification and their equivalents.

For a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or the equivalent of the structure described in the patent specification. The manifold pressure detector in the Honda device is not the structural equivalent of the potentiometer disclosed in Semmler as the means for monitoring the selecting means. The Honda device does not include a structure for monitoring the selecting means which is identical to or the structural equivalent of the means disclosed in Semmler. Thus, there is no

literal infringement of Claims 1, 5 or 17 because this element of the Semmler device is not found in the Honda device.

This does not end the inquiry, however, because the Honda device could nevertheless be found to infringe the Semmler patent under the doctrine of equivalents.

### 2. Infringement Under The Doctrine of Equivalents

"The doctrine of equivalents has a different purpose and application than section 112. The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes." *Valmont Industries*, 983 F.2d at 1043. An equivalent under the doctrine of equivalents results from an insubstantial change which, from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention. An equivalent under the doctrine of equivalents, though not literally meeting the claims, still infringes the patent. *Id.* The doctrine of equivalents involves a familiar three-part inquiry. "An accused device which 'performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention,' ... is an equivalent." *Valmont Industries*, 983 F.2d at 1043 (quoting *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988)) (footnote omitted).

> What constitutes equivalency must be determined against the context of a patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect.

*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

> Consideration must be given to the purpose for which an ingredient is used in the patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons rea-

sonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Id.*

In *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997), the Supreme Court held that the doctrine of equivalents must be applied to the individual elements of the claim, not to the invention as a whole. The court cautioned against applying the doctrine of equivalents in such a manner that it would effectively eliminate an element of an invention in its entirety. *Id.* ("It is important to ensure the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.")

In *Warner–Jenkinson*, 520 U.S. at ——, 117 S.Ct. at 1053, the Supreme Court declined to disturb prior rulings of the federal circuit holding that the issue of whether an accused process is equivalent to the claimed process is a question for the jury. However, the court went on to point out that where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment, and that legal limitations on the application of the doctrine are to be determined by the court. *Id.*, n. 8.

The issue in the instant case is whether means for monitoring intake manifold pressure or Pb in the Honda device is the equivalent of means for monitoring the state of the throttle in the Semmler patent.

The basic concept of the Semmler device is the combination of the means for monitoring the speed of the engine and the means for monitoring the position of the throttle, with the two monitoring means being linked together in a control circuit which provides a fixed relationship between the speed of the engine and the position of the throttle so that the fuel supply is interrupted whenever the engine speed exceeds that speed which is normally associated with the position of the throttle. Thus, an essential element of the Semmler device is a means for monitoring the position of the throttle.

The accused device is different from the Semmler device in that it monitors engine speed and Pb and interrupts the fuel supply above a set engine speed whenever Pb reaches a certain negative value. Semmler argues that Pb varies in direct proportion to throttle position, and that accordingly, measuring Pb is the same as measuring throttle position. Honda counters by arguing that under transient conditions, there is no direct relationship between Pb and throttle position, and that Pb is not constant for any given throttle position, but varies in relation to engine demand or load. Citing Otobe and Hisatomi, Semmler argues that those skilled in the art recognize that Pb may be substituted for throttle position in a fuel control system.

 The Court entertains some doubt as to whether at the time Semmler was issued, it would have been possible to substitute Pb for throttle position in order to effect fuel cuts based on the overrunning fixed relationship described in Semmler. However, as the Supreme Court pointed out in *Warner–Jenkinson*, "the proper time for evaluating equivalency—and thus knowledge of interchangeability between elements—is at the time of infringement, not at the time the patent was issued." 520 U.S. at ——, 117 S.Ct. at 1053. Semmler asserts that it is possible to develop algorithms for a computer control device in order to take into account those situations in which there is no direct correspondence between throttle position and Pb. Although it is a close question, the Court concludes that the question of whether monitoring Pb is the equivalent of monitoring throttle position presents genuine issues of material fact which preclude summary judgment on this issue.

## C. THE OVERRUNNING FIXED RELATIONSHIP—FUEL CUT WHENEVER THE ENGINE IS OVERRUNNING

Claims 1 and 5 of the Semmler patent are limited to a device which incorporates a control circuit which provides a fixed relationship between the position of the throttle and the speed of the engine so that there is a fuel cut whenever the engine is overrunning. Claim 17 is not limited to a device containing a control circuit which provides such a fixed relationship, but is limited to a device which includes means for interrupting the supply of fuel whenever the engine is overrunning. Since Semmler defines overrunning as the condition which exists whenever the engine speed exceeds that speed which is associated with a particular position of the throttle, it is implicit in Claim 17 that the means for interrupting the fuel supply would include the same fixed relationship specified in Claims 1 and 5. Thus, every independent claim of the Semmler patent either expressly or by implication is limited to a device which incorporates the overrunning fixed relationship in the control means, and each independent claim is expressly limited to a device which cuts the fuel whenever the engine is overrunning.

### 1. Literal Infringement

The Honda device does not use an overrunning fixed relationship to determine when a fuel cut should occur, and it does not cut the fuel whenever the engine is overrunning. Semmler acknowledges this and concedes that the Honda device does not literally infringe his patent. Semmler maintains, however, that the Honda device infringes this claim limitation under the doctrine of equivalents. Honda denies this and advances the argument that the doctrine of prosecution history estoppel precludes Semmler from asserting infringement of these limitations under the doctrine of equivalents.

### 2. Prosecution History Estoppel

 Prosecution history estoppel is a legal limitation on the doctrine of equivalents. It applies when a patent is amended to avoid prior art or a specific concern such as obviousness that arguably would have made the subject matter unpatentable. Any matter thus abandoned cannot be recaptured under the doctrine of equivalents. *See, e.g., Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir.1983). The standard for determining whether particular subject matter was relinquished is an objective one. It depends on what a competitor reasonably would conclude from the parent's prosecution history. *Zenith Laboratories, Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1424 (Fed.Cir.), *cert. denied,* 513 U.S. 995, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994). The application of prosecution history estoppel is a question of law. *LaBounty Mfg.,*

*Inc. v. U.S. Int'l. Trade Com'n,* 867 F.2d 1572, 1576 (Fed.Cir.1989). The burden is on the patent holder to establish the reason for an amendment, and the court must then decide whether that reason is sufficient to overcome the doctrine of prosecution history estoppel. *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1051. "Where no explanation is established, however, the court should presume that the PTO had a substantial reason related to patentability for including the limiting element added by amendment." *Id.*

### 3. Prosecution History Of The Semmler Patent

Claim 1 of Semmler's original patent application described a fuel control apparatus with means for interrupting the supply of fuel comprising two actuating devices, one being activated when a speed value is exceeded with the throttle in the closed position (closed throttle fuel cut), and the other being activated when a predetermined vehicle speed is exceeded (excess speed governor). Jt.Ex.II, p. 23.

Claim 12 of the original application, which was a dependent claim to Claim 1, described an apparatus having a control circuit which provides a fixed relationship between the state of the selecting means and engine speed "in such manner that whenever engine speed exceeds that speed, which is associated with a predetermined state of the selecting means, the said switching means operates the said control device to interrupt the supply of fuel." Jt.Ex.II, p. 26. There was no reference to overrunning or fuel saving in any of the original claims. The examiner denied the original claims as unpatentable over Patent # 3,736,910, issued to Raff. Jt. Ex.II, pp. 71–73. The Raff patent describes an engine control device which effects a fuel cut in the closed throttle position when a set maximum engine speed is exceeded.

In response to this rejection, Semmler amended his original application by canceling Claim 1, converting Claim 12 into an independent claim and amending it by adding to it the closed throttle fuel cut and speed gov-

ernor described in original Claim 1. Jt.Ex.II, pp. 76–78. Thus, new Claim 12 described a device which included a closed throttle fuel cut, a speed governor, and an open throttle fuel cut based upon a fixed relationship between engine speed and throttle position (open throttle fixed relationship fuel cut). He also added a new Claim 25, which was limited to the open throttle fixed relationship fuel cut. Finally, he added a new Claim 26, which claimed a means for interrupting the supply of fuel "whenever the engine is overrunning, which is independent of the position of the selecting means."[3] Jt.Ex.II, p. 79. Thus, by virtue of his December 28, 1976 amendments, two of the claims, Claims 12 and 25, included an open throttle fuel cut based on a fixed relationship between engine speed and a predetermined throttle position, and Claim 26 described a fuel cut which would occur whenever the engine is overrunning, independent of throttle position. In explaining the effect of these amendments in an attempt to overcome the previous rejection, Semmler argued that according to an embodiment of his invention, obviously referring to new Claim 26, "fuel savings can be achieved during every type of over-run." Jt.Ex.II, p. 82. He went to explain how to determine whether the engine is overrunning by monitoring the position of the throttle and measuring vehicle speed or engine speed, and noted "[i]f the engine or vehicle speed is exceeded, then this is an indication that the engine is operating in over-run." *Id.* He concluded by arguing that his invention differed from Raff because Raff provided only a closed throttle fuel cut and "Raff does not disclose or suggest providing means for effecting an interruption of the supply of fuel ... whenever the engine is over-running, which is independent of the position of the selecting means as disclosed and claimed by applicants [sic]." *Id.* at 83–84. Thus, Semmler argued that Raff disclosed only a closed throttle fuel cut, while his fuel cut was independent of the position of the throttle.

On January 15, 1979, the PTO responded to the amendments by rejecting all of Semmler's claims.[4] Jt.Ex.II, pp. 88–89. The

---

3. After further amendments, amended Claim 12 became Claim 1 of the patent as issued, Claim 25 became Claim 5 of the patent as issued, and Claim 26 became Claim 17 of the patent as issued.

4. In both rejections, the examiner also cited Rachel, U.S. Patent No. 3,889,747, which describes

examiner rejected the claims as obvious over Raff in view of Adler, et al., U.S. Patent # 3,699,935. Adler disclosed a control system for an electrically controlled fuel injection system for an internal combustion engine, wherein the control circuit receives electrical signals indicating the position of the accelerator pedal, engine speed and the position of the control element which determines the quantity of fuel injected. The Adler device monitors all of the control signals of the fuel injection system, and its control circuit is constructed in such a way that the supply of fuel is reduced in the event any of the control signals should be interrupted. The purpose of the Adler device is to protect the engine from damage caused by excessive speed in the event of a malfunction of any of the control circuits in the fuel injection system. When activated, the Adler device reduces the fuel supply to a minimum so that the vehicle can "limp home" without damaging the engine.

The examiner reasoned, Jt.Ex.II, p. 89, that Semmler's amended claims were met by Raff,

> except Raff does not continuously compare throttle position to engine speed throughout the total operating range of the throttle. However, the Adler reference controls overrun throughout the operating range of the throttle. Therefore, it would be an obvious expedient to one skilled in the art to provide Raff with the aforementioned structure in view of the teaching of Adler, et al.

Although the fuel cut in Adler is not triggered by comparing throttle position and engine speed, but instead by a failure of one of the circuits which control the fuel injection system, the Adler device does, as the examiner pointed out, compare throttle position and engine speed throughout the total operating range of the throttle. Apparently, the examiner concluded that it would be obvious to one skilled in the art to combine such a device with the closed throttle fuel cut disclosed in Raff and thus produce an apparatus like Semmler's which was capable of interrupting the supply of fuel throughout the operating range of the throttle.

a speed governor for an engine with an electron-

It is immaterial whether the examiner was right or wrong in raising this objection on the basis of Adler. *See Warner–Jenkinson,* 520 U.S. at —— n. 7, 117 S.Ct. at 1051 n. 7.

On May 15, 1979, Semmler responded to the rejection by submitting additional amendments to his claims. He amended Claim 12 by adding the words *"that is, whenever the engine is over-running"* to describe the fixed relationship between engine speed and throttle position which would trigger a fuel cut. Jt.Ex.II, p. 94. (Emphasis in original). He also added the words *"to effect a considerable fuel saving."* *Id.* (Emphasis in original). He made identical amendments to Claim 25. Claim 26, which already contained the limitation "whenever the engine is over-running," was amended by adding the words *"whereby considerable saving is obtained."* *Id.* at 95. (Emphasis in original). Thus, whereas prior to these amendments, only one of Semmler's claims contained the limitation "whenever the engine is over-running," as a result of these amendments, all of the claims were so limited and by virtue of these amendments, all of the claims were limited by the language "to effect a considerable fuel saving."

In arguing that these amendments overcame the examiners objections, Semmler again argued that, unlike Raff, his device provided "means for effecting an interruption of the fuel supply ... whenever the engine is over-running, which is independent of the position of the selecting means[.]" Jt.Ex.II, p. 96. Semmler further argued that a combination of Raff and Adler does not lead to his invention because in Adler, the fuel supply is reduced to a minimum only when one of the control circuits fails. *Id.* at 97. Thus, Semmler argued "[b]y this safety means, no savings in fuel is obtained[.]" He went on to argue, *Id.* at 98–99, that the electrical fuel control device in Adler would not interrupt the fuel supply throughout the operating range of the throttle:

> [I]t is only at the relatively high engine speed above point 15 that the fuel supply is drastically reduced so as not to exceed the

ic fuel injection system.

maximum permissible engine speed and thereby damage the motor. Adler, et al. do not provide means for effecting an interruption of the supply of fuel from the fuel supply means whenever the engine is over-running, which is independent of the position of the selecting means whereby considerable fuel saving is obtained as disclosed and claimed by applicant.

### 4. Meaning of "Whenever"

Semmler now argues that in distinguishing the prior art cited by the examiner, it was only necessary for him to show that his invention effected a fuel cut during both open and closed throttle overrunning and that accordingly, he is "not estopped to assert the doctrine of equivalents against Honda's fuel cut system that also cuts the fuel during both open and closed throttle over-running." Plaintiff's Combined Memorandum in Opposition to Honda's Motion for Summary Judgment of Non–Infringement and Invalidity, page 18. He argues that in the phrase "whenever the engine is over-running," he used the word "whenever" in its adverbial sense meaning "no matter when," instead of "each and every time." In this manner, Semmler is able to assert that in the proceedings before the patent office, he did not limit his invention to a device which would interrupt fuel supply each and every time the engine is overrunning, but that his claims were broad enough to cover any device which, like the accused device, effects both open and closed throttle fuel cuts. These arguments are unpersuasive.

The word "whenever" can be used as an adverb and as a conjunction. When used as an adverb, the word "whenever" means "at whatever time," or "no matter when," such as in the sentence: "We can leave whenever." Webster's Third New International Dictionary 2602 (1981). The word "whenever" can also be used as a subordinating conjunction which connects a subordinate clause to a main clause. When used as a conjunction, the word "whenever" can mean "at any or all times that" or "in any or every instance in which." *Id.* This use of "whenever" is meant to convey the existence of a consistent cause and effect relationship between the events in the "whenever" cause and the events in the main clause. Examples of this usage are:

"Whenever it rains, he carries his umbrella."; "Whenever the large hand of the grandfather clock is over the number twelve, the chimes ring the hour." The word "whenever" used as a conjunction may also take its adverbial meaning. Examples of this would include: "Whenever [at whatever time, no matter when] you need help, I will assist you."; "Whenever you are ready, we will leave." In this latter usage, the word "whenever" begins a clause containing a conditional event or circumstance which may or may not happen to trigger the result in the main clause. This meaning of "whenever" entails an element of randomness and uncertainty, leaving open the possibility that the conditional event may never occur.

In the claims of the Semmler patent, the phrase "that is, whenever the engine is over-running" is a parenthetical phrase which explains the preceding phrase "whenever engine speed exceeds that speed which is associated with a predetermined state of the selecting means" and further defines the fixed relationship which will trigger the fuel cut. Claim 1, of the Semmler patent, Joint Exhibit I, column 9, beginning at line 46, reads as follows:

the two said monitoring means being linked together in a control circuit which provides a fixed relationship between the state of the said selecting means and engine speed, in such a manner that *whenever* engine speed exceeds that speed which is associated with a predetermined state of the selecting means, *that is, whenever the engine is over-running*, the said switching means operates the said control device to interrupt the supply of fuel[.] (Emphasis added).

In this sentence, the first "whenever" is used as a subordinating conjunction linking the phrases "whenever engine speed exceeds that speed," with the phrase "the said switching means operates the said control device." Semmler concedes that the first "whenever" should be given the meaning "each and every time," but argues that in the parenthetical phrase, it should be given its adverbial meaning, "no matter when." However, since the second "whenever" commences a parenthetical phrase intended to explain the preceding "whenever" phrase and to function as a defi-

nition of that phrase, it is logical to conclude that both "whenevers" are used in the same sense, meaning "each and every time."

Further, since the topic at issue is a device which produces a result, *i.e.,* the interruption of fuel, upon the occurrence of a stimulus, *i.e.,* where engine speed exceeds that speed which is associated with a predetermined throttle setting, it makes more sense, in terms of describing a working, effective invention, to construe "whenever" as meaning that the fuel supply is cut each and every time the stimulus of engine overrunning occurs. This usage is more appropriate in a description of how a device works. As indicated by the previous examples, construing the word "whenever" in its conditional sense of "at whatever time" or "no matter when" suggests that the condition, engine overrunning, might never occur. Such a suggestion, in addition to being inconsistent with the normal operation of an automobile, would also be out of context in and irrelevant to a description of how a device works in response to the stimulus of overrunning when it does occur. Even if "whenever" is defined as "at whatever time" or "no matter when", the second "whenever" clause, given its context, could only be reasonably construed as meaning that the fuel saving is effected "each and every time the engine is overrunning, regardless of at what time that occurs." Thus, in this instance, "at whatever time" and "each and every time" would no doubt mean the same thing to a person skilled in the art of automotive fuel control systems.

## 5. Driveability Issue

The Court has determined that "whenever" as used in the Semmler patent, has its usual and customary meaning, that is, "each and every time." Semmler argues that a device constructed in accordance with this interpretation would render an automobile "virtually undriveable, fundamentally unsafe, and certainly unsaleable". Plaintiff's Combined Memorandum In Opposition To Honda's Motions For Summary Judgment Of Non-infringement and Non-validity, page 3. Whether or not this is the case, it is irrelevant. As the Court noted in its opinion and order of September 30, 1996, at p. 17: "There is no discussion of driveability problems in relation to setting the fuel cut. Fuel saving, not driveability, is the primary goal of the invention as described by Semmler." Some of the patents for automotive fuel control systems presently before the Court contain provisions for avoiding driveability problems. With the possible exception of teaching that the overrunning fixed relationship should be set in such a way that the maximum vehicle speed can be obtained under the most favorable anticipated operating conditions, the Semmler patent ignores driveability problems. Evidence in the *Markman* hearing indicated that potential licensees of the Semmler device rejected it because of anticipated driveability problems. *See, e.g,* exhibits CC and HH. Semmler's arguments about driveability problems have not persuaded the Court to modify its interpretation of Semmler's claims as set forth in its orders of September 30, 1996 and December 16, 1996. Those arguments were fully considered by the Court when it interpreted the patent claims.

## 6. Doctrine of Prosecution Estoppel Applied

Before the May 15, 1979 amendments, Claims 12 and 25 were broad enough to cover an open throttle fuel cut based on any fixed relationship between throttle position and engine speed. When the examiner asserted that it would be obvious to combine Raff and Adler to interrupt the fuel supply throughout the total operating range of the throttle, Semmler narrowed the open throttle fuel cuts of Claims 12 and 25 from *any* fixed relationship between throttle position and engine speed to only the overrunning fixed relationship as he defined it, and he further limited these claims to a device which would interrupt the fuel supply whenever the engine was overrunning. Claim 26 was already subject to these limitations. He then added the considerable fuel saving limitation to all three of his independent claims. He argued that the Raff/Adler combination did not render his invention obvious because: 1) Adler does not save fuel since it becomes effective only if there is a disturbance in one of the electronic fuel control circuits; and 2) Adler's fuel cut is effected only at a relatively high engine speed, not whenever the engine is overrunning. In arguing that these amendments overcame the Adler/Raff combination,

Semmler said the amendments "emphasize that the interruption of fuel occurs whenever the engine is over-running to effect a considerable fuel saving."

▮ The Court concludes that when Semmler amended his patent to overcome the second rejection of his claims, he limited his device to one which incorporated the over-running fixed relationship as defined in his patent, and he limited his device to one which would interrupt the supply of fuel each and every time the speed of the engine exceeded the speed associated with a particular throttle setting in order to effect a considerable fuel saving. This is what a competitor reasonably would conclude from the prosecution history of the Semmler patent. Thus, the doctrine of prosecution estoppel would bar Semmler from attempting to recapture under the doctrine of equivalents a device which interrupts the supply of fuel based on any fixed relationship between engine speed and throttle position other than the overrunning fixed relationship defined in the specification of his patent. He is likewise barred from attempting to recapture a device which does not interrupt the fuel supply each and every time the engine is overrunning. Thus, Semmler cannot argue that the Honda device, which does not use the overrunning fixed relationship to determine when fuel cuts should occur, and which does not interrupt the supply of fuel whenever the engine is overrunning, infringes his patent under the doctrine of equivalents.

### 7. Infringement Under the Doctrine of Equivalents

Assuming *arguendo* that prosecution history estoppel does not preclude Semmler from invoking the doctrine of equivalents, the Court will proceed to examine Semmler's arguments regarding infringement under the doctrine of equivalents.

Semmler argues that the fact that the Honda device does not interrupt the fuel supply whenever the engine is overrunning does not negate equivalence because: "The result, i.e. the fuel saving achieved by the Honda system, is substantially the same as that which would be achieved by the claimed invention." Plaintiff's Combined Memorandum in Opposition to Honda's Motions for Summary Judgment of Non–Infringement and Invalidity, page 3. This argument invites the Court to ignore one of the limitations of the Semmler patent and focus instead on the result of the invention as a whole as measured by fuel saving. This would violate the rule of *Warner–Jenkinson,* which requires an element-by-element application of the doctrine of equivalents. The correct analysis under *Warner–Jenkinson* is whether the fuel cuts effected by the Honda device are the substantial equivalent of interrupting the fuel supply whenever the engine is overrunning as that term is used in the Semmler patent. Clearly, they are not.

The fixed relationship which determines when the supply of fuel is interrupted in the Honda device is a fixed relationship between Pb and the maximum allowable temperature of the catalytic converter. *See* Plaintiff's Ex. 24, Otobe Patent, Column 7, Lines 27–32. In contrast, the fixed relationship which determines when the interruption of the fuel supply occurs in the Semmler device is the fixed relationship between throttle position and engine speed. In the Semmler device, fuel cuts can occur throughout the operating range of the engine. The Honda device does not interrupt the fuel supply over the entire operating range of the engine. In the Honda device, there are no fuel cuts below 2,000 RPM. The fuel cuts effected by the Honda device all occur below the no load line. *See Id.,* Figure 5. The fuel cuts effected by the Semmler device occur at or near the road load line.

Honda's expert, Stephen J. Citron, performed tests on three Honda vehicles in order to compare the fuel cuts which occurred using the Honda device with the fuel cuts which would occur using the Semmler device. The federal Environmental Protection Agency ("EPA") test protocol, known as FPT–75, was used for these tests. The FPT–75 test cycle is used to determine the fuel efficiency and emissions production of automobiles. It is designed to replicate typical urban driving conditions. The three Honda vehicles were tested to determine how many fuel cuts occurred during the FPT–75 test using the Honda fuel control system. The three vehicles were then reprogrammed to more nearly conform to the Semmler device. The total time of the FTP–75 test is 1,372 seconds. Using the Honda system, two of the vehicles

had no open throttle fuel cuts during the FPT–75 test, while the third had approximately 3.2 seconds of open throttle fuel cuts. In contrast, when reprogrammed to more nearly conform to the Semmler device, these cars had 56 seconds, 80 seconds, and 56 seconds of open throttle fuel cuts. When the cars were reprogrammed to simulate the Semmler device, the fuel cuts occurred at the no load line. This is nearer, but still below the range at which fuel cuts would actually occur with the Semmler device. Even more fuel cuts would occur if they were based on road load, as taught by Semmler. Semmler does not dispute the results of these tests but argues only that there is no significant difference in the amount of fuel saving achieved by the two devices.

■ The fixed relationship between Pb and engine speed which initiates the fuel cuts in the Honda device is not the equivalent of the fixed relationship between engine speed and throttle position which triggers the fuel cuts in the Semmler device. The Honda device does not interrupt the fuel supply whenever the engine is overrunning. The Honda fixed relationship does not function in the same way as the Semmler fixed relationship because it effects fuel cuts in a significantly different operating range of the engine. The two fixed relationships do not serve the same purpose. The purpose of the Semmler fixed relationship is to save fuel by cutting the fuel whenever the engine is overrunning, whereas the primary purpose of the fixed relationship in the Honda device is to protect the catalytic converter from excessive temperatures. The two fixed relationships do not obtain the same result, because they produce a significantly different number of fuel cuts in significantly different engine operating ranges. No reasonable jury could determine that these two elements are equivalent. Honda is entitled to summary judgment on the issue of whether, under the doctrine of equivalents, its fuel control system infringes the limitations of the Semmler patent which require: 1) fuel cuts based on an overrunning fixed relationship; and 2) fuel cuts whenever the engine is overrunning.

## D. CONSIDERABLE FUEL SAVING

Each of the independent claims of the Semmler patent are limited to a fuel control apparatus which will effect a considerable fuel saving. This limitation expressly applies to the overrunning open throttle fuel cut device which is part of the apparatus described in Claim 1 of the patent but not to the closed throttle fuel cut which is part of the apparatus described in Claim 1. (See Jt.Ex. I. Col. 9, Lines 38–40). It applies to the overrunning open throttle fuel cut device described in Claim 5, and it applies to the apparatus described in Claim 17, which is an overrunning fuel cut which is independent of the position of the throttle. Closed throttle fuel cuts were known in the prior art. Semmler distinguished them in prosecuting his patent. On this basis, and considering also the fact that Semmler did not apply this limitation to the closed throttle fuel cut specifically described in Claim 1, the Court finds that the limitation "to effect a considerable fuel saving" applies only to the open throttle fuel cuts effected by the Semmler device. Hence, any fuel saving effected by closed throttle fuel cuts would be ignored in determining whether an accused device meets this limitation of the Semmler patent. Although Semmler now takes a different position, this is contrary to his own interpretation of this claim limitation in the *Markman* hearing. See Pre–*Markman* Hearing Order, Attachment A ("Consequently, any incremental fuel savings 'worthy of consideration' or 'of consequence' that are achieved over and above the savings obtained with a closed throttle fuel cut would be 'considerable' within the meaning of the claims.")

Honda asserts that its device is neither intended to nor does it effect any significant fuel savings. As noted above, the Court has interpreted this limitation to mean a fuel saving that one skilled in the art in 1976 would have considered large, substantial or important. September 30, 1996, Mem. Op. & O., p. 18. Assuming *arguendo* that this claim limitation is not void for indefiniteness, the Court will consider the parties' respective arguments regarding Semmler's claim that the Honda device infringes this limitation of his patent.

Honda supports its motion for summary judgment on this issue with the results of the FTP–75 tests on four Honda automobiles,

which resulted in no open throttle fuel cuts on three of the vehicles and only 3.2 seconds of open throttle fuel cuts on the fourth vehicle. Semmler counters this evidence with the results of tests conducted by his experts. On March 15, 1996, Semmler's expert, Alfred G. Collins, conducted four FTP-75 tests on a 1993 Acura Integra. These tests yielded the following fuel savings for the open throttle fuel cuts: 1.01%; 1.98%; 1.30%; .81%; average, 1.28%. On May 9 and 10, 1996, Collins conducted EPA alternative mileage accumulation procedure road tests on a 1991 Honda Accord and a 1992 Honda Civic. These tests yielded the following fuel savings for the open throttle fuel cuts: 1.31%; 4.62%; .52%; .99%. On June 18, 1996, Collins conducted three FTP-75 tests on the same 1992 Honda Civic and 1991 Honda Accord, with the following percentage fuel savings, due to the open throttle fuel cuts: 1.5%; .66%; 1.93%; 1.36%.

Although Semmler's experts assert that these tests reveal that the Honda device effects a considerable fuel saving, the Court concludes that no reasonable jury could find that one skilled in the art in 1976 would have considered these fuel savings large, substantial or important. Indeed, it is unlikely that fuel savings of this amount would have been detectable or reliably reproducible in a typical 1976 vintage automobile. The Court concludes that Semmler's claim that the Honda device infringes the "considerable fuel saving" limitation of his patent does not present a genuine issue of material fact and that Honda is entitled to summary judgment on this issue.

### · CONCLUSION

In accordance with the foregoing, Honda's motion for summary judgment on the grounds of invalidity is granted and Honda's motion for summary judgment on the grounds of non-infringement is granted.

The Clerk shall enter final judgment in favor of the defendants dismissing plaintiff's complaint with prejudice at plaintiff's costs.

It is so ORDERED.